T.R. COLEMAN, et al., Plaintiffs,

v.

CANNON OIL COMPANY, et al., Defendants.

Civ. A. No. 90–T–414–S.

United States District Court, M.D. Alabama, S.D.

Nov. 19, 1993.

Edward M. Price, Jr., Rufus R. Smith, Jr., Dothan, AL, L. Andrew Hollis, Jr., Jeffrey C. Kirby, Birmingham, AL, Kenneth Millwood, Aaron Watson, Scott Tippett, John Latham, Sylvia Kochler, Valerie Verduce, Edward C. Brewer, Atlanta, GA, for plaintiffs.

W. Terry Travis, Dennis Pierson, George L. Beck, Jr., Montgomery, AL, for defendants Southeastern Oil, McGee Oil and A.W. Herndon Oil Co.

Joseph Mays, Jr., David Hymer, Cada Carter, Birmingham, AL, for defendants Home Oil and Thomas A. Shirley.

Charles L. Robinson, David Proctor, Birmingham, AL, for defendant Graceville Oil Co.

C.H. Espy, Jr., Dothan, AL, for Sheffield Oil Co.

T.E. Buntin, Jr., Dothan, AL, and Thomas S. Lawson, James N. Walter, Montgomery, AL, for defendants Cannon Oil and Vernon Cannon.

Charles Stewart, Montgomery, AL, Marsha Rydberg, Rydberg, Goldstein & Bolves, P.A., Tampa, FL, J. Riley Davis, Tallahassee, FL, for defendant Sunshine–Jr. Stores.

Rodney Parrish, pro se.

Ezra B. Jones, III, Atlanta, GA, for Davis & Harp Oil Co. and Herndon Oil Co.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In this class-action lawsuit, plaintiffs, who are individual gasoline consumers, charged that defendants, who are retail sellers of gasoline, violated federal antitrust laws by

conspiring to fix gasoline prices in Dothan, Alabama. Plaintiffs are: T.R. Coleman; Bernard J. Petit; and R.L. and Lucy Middleton. Defendants are: Sunshine–Jr. Stores, Inc.; Rodney Parrish; Vernon Cannon and his company, Cannon Oil Company; Thomas Shirley and his company, Home Oil Company; and James Sheffield and his company, Sheffield Oil Company.[1] Plaintiffs seek damages and injunctive relief under § 1 of the Sherman Act, 15 U.S.C.A. § 1 (West Supp. 1993), and § 4 and § 16 of the Clayton Act, 15 U.S.C.A. §§ 15, 26 (West Supp.1993). Plaintiffs properly invoked the court's jurisdiction pursuant to 28 U.S.C.A. §§ 1331 (West 1993), 1337 (West Supp.1993).

After a month-long trial, a jury found that defendants had engaged in illegal price fixing but awarded only nominal damages of one dollar. Defendants have filed motions requesting that the court enter judgment in their favor as a matter of law. Plaintiffs have filed motions requesting that the court treble the nominal damages award and enter a final injunction prohibiting defendants from engaging in future illegal price fixing. For the reasons given below, the court will grant plaintiffs' motion to enter a final injunction and defendant Sunshine–Jr. Stores' motion for judgment as a matter of law and will deny the other motions.

## I. BACKGROUND

Plaintiffs filed this lawsuit on April 19, 1990, charging several persons and their businesses with conspiring to fix the retail price of gasoline in Dothan, Alabama. The original defendants consisted of the following: Sunshine–Jr. Stores; Rodney Parrish; Vernon Cannon and his company, Cannon Oil Company; Thomas Shirley and his company, Home Oil Company; and James Sheffield and his company, Sheffield Oil Company; Southeastern Oil Company, Inc.; Davis & Harp Oil Company, Inc.; Herndon Oil Company, Inc.; Beard Oil Company; A.W. Herndon and his company, A.W. Herndon Oil Company, Inc.; McGee Oil; and Graceville Oil Company, Inc. The court certified a plaintiff class for "damages" consisting of "all individuals and entities who made retail purchases of gasoline from the defendants in the Houston County, Alabama area since April 15, 1986."[2] The court dismissed Beard Oil Company[3] and entered summary judgment in favor of Southeastern Oil Company, Davis & Harp Oil Company, Herndon Oil Company, and McGee Oil Company.[4] The plaintiffs settled their claims against Graceville Oil Company[5] and against A.W. Herndon and his company, A.W. Herndon Oil Company.[6] This case went to trial as to the remaining defendants—Sunshine–Jr. Stores, Rodney Parrish, Vernon Cannon and Cannon Oil Company, Thomas Shirley and Home Oil Company, and James Sheffield and Sheffield Oil Company—who are collectively referred to in the remainder of this order as just the defendants. A jury found that these defendants had engaged in illegal price fixing and that they should pay nominal damages of one dollar. The parties responded to the verdict with the motions now before the court.[7]

1. Vernon Cannon died after this litigation began. His wife Metha Jean Cannon replaced him as a defendant in her capacity as executrix of his estate. For ease of discussion, the court will continue to refer to Mr. Cannon as the defendant.

2. *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 519 (M.D.Ala.1992). The court, however, denied plaintiffs' request to certify a plaintiff class with regard to "injunctive relief." *Id.*

Also, the City of Dothan is within Houston County, Alabama.

3. Order of March 4, 1993.

4. Order of January 30, 1992, 1992 WL 111584.

5. Order of June 17, 1992.

6. Order of April 20, 1993.

7. After the trial, plaintiffs asked the court to reconsider its order granting summary judgment in favor of Southeastern Oil Company, Herndon Oil Company, McGee Oil Company, and Davis & Harp Oil Company. Plaintiffs also asked the court to add new individual defendants. Plaintiffs contended that the trial evidence reflected that these persons and companies were part of the trial defendants' conspiracy to fix prices. By order dated February 24, 1993, the court denied the plaintiffs' request as untimely. *See DeBruyne v. Equitable Life Assurance Society of the United States*, 920 F.2d 457, 471 (7th Cir.1990) (on a motion to reconsider, a court ordinarily will not hear evidence that was within the moving party's knowledge at the time of the initial decision); *Barton v. American Red Cross*, 826 F.Supp. 407, 409 (M.D.Ala.1993) (Thompson, J.) (same).

## II. DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW

As stated, plaintiffs sought relief under the antitrust laws of the United States: § 1 of the Sherman Act, 15 U.S.C.A. § 1 (West Supp.1993), and § 4 of the Clayton Act, 15 U.S.C.A. § 15 (West Supp.1993).[8] Section 1 of the Sherman Antitrust Act provides that, "Every contract, combination ... or conspiracy, in restraint of trade or commerce ... is ... illegal." Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained." With these laws, "Congress was dealing with competition, which it sought to protect." *Standard Oil Co. v. F.T.C.,* 340 U.S. 231, 249, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951) (citation omitted). As this court explained in its instructions to the jury, "The purpose of the antitrust laws is to preserve our system of free and open competition, the most important part of our private enterprise system." "These laws," the court continued, "promote the concept that free competition results in the best allocation of economic resources, to the end that the consuming public may receive better goods and services at a lower cost."

▪ Plaintiffs charged that defendants violated § 1 of the Sherman Act by entering into a "contract, combination, or conspiracy" among themselves and with others "in restraint of trade or commerce" to fix the retail price of gasoline in the Dothan, Alabama market. With the phrase "contract, combination, or conspiracy," Congress sought "to embrace a single concept"—that is, an agreement, express or implied, between two or more persons—and thus the terms in the phrase are used interchangeably. Phillip E. Areeda, Antitrust Law ¶ 1400a at 3 (1986) (hereinafter referred to as "Areeda"). Section 1 of the Sherman Act does not prohibit independent business decisions and actions. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 760, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

▪ With the phrase "in restraint of trade or commerce," Congress did not seek to prohibit all agreements that restrain trade or commerce but only those that impose an "unreasonable restraint." *N.C.A.A. v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 98, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984). However, certain agreements, including conspiracies to fix prices, have been held to be per se unreasonable and always illegal, meaning that no demonstration of an unreasonable restraint on competition is required. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). This conclusion rests on the empirical observation that such agreements "'would always or almost always tend to restrict competition and decrease output.'" *N.C.A.A.,* 468 U.S. at 100, 104 S.Ct. at 2959 (quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)).

▪ Finally, § 4 of the Clayton Act requires that a plaintiff who has demonstrated a Sherman Act violation also prove an injury to his or her business or property from the violation and provide some indication of the amount of damage done. *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752, 782 (11th Cir. 1983). "The plaintiff must introduce substantial probative facts demonstrating that some damage flowed from the unlawful conspiracy." *Id.*

▪ To prevail under § 1 of the Sherman Act against a defendant, therefore, a plaintiff has to establish the following: first, that there was a conspiracy involving the defendant; and, second, that the purpose of the conspiracy was to fix the retail price of gasoline in the targeted market. A common plan or understanding between two or more persons to adopt or follow any pricing formula which will result in raising, lowering, or maintaining prices or price ranges charged for goods or services would constitute a price-fixing conspiracy in violation of § 1 of the Sherman Act. And, third, to obtain relief under § 4 of the Clayton Act, the plaintiff must also show injury in his or her business

---

**8.** Plaintiffs also seek prospective injunctive relief under § 16 of the Clayton Act, 15 U.S.C.A. § 26 (West Supp.1993); this requested relief is discussed later in this memorandum opinion.

or property as a result of the conspiracy. *See, e.g., Storer Cable Communications v. Montgomery, Ala.,* 826 F.Supp. 1338, 1349 (M.D.Ala.1993) (Thompson, J.).

Defendants request that the court set aside the jury's finding that they violated the federal antitrust laws, and they ask that the court enter judgment as a matter of law in their favor pursuant to Rule 50 of the Federal Rules of Civil Procedure (1993). Rule 50 provides that, "If ... a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross claim, or third-party claim that cannot under the controlling law be maintained without a favorable finding on that issue." In determining whether to grant or deny a Rule 50 motion, all the evidence must be considered in the light, and with all reasonable inferences, most favorable to the party opposed to the motion. The motion may be granted only if the evidence points so overwhelmingly in favor of the moving party that no reasonable person could draw a contrary conclusion. Where reasonable people could differ on the basis of substantial, conflicting evidence, the motion must be denied. *Martinez v. City of Opa–Locka,* 971 F.2d 708, 711 (11th Cir.1992) (per curiam).

In determining whether evidence is sufficient to withstand a Rule 50 motion for judgment as a matter of law, defendants correctly point out that, because the Rule 50 standard is, for the most part, identical to that for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (1993), this court is constrained by the Supreme Court's application of Rule 56 in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There, in finding that summary judgment was appropriate against two American firms on their claim that several Japanese companies had engaged in a predatory pricing conspiracy aimed at driving American firms from the American consumer electronic products market, the Court wrote: first, that the fact that defendants simply "had no rational economic motive to conspire," *id.* at 596, 106 S.Ct. at 1361, combined with evidence that the defendants' conduct was "consistent with other, equally plausible [innocent] explanations" implied that the defendants' conduct could "not give rise to an inference of conspiracy," *id.* at 596–97, 106 S.Ct. at 1361; and, second and more importantly, that, even if the defendants had a rational economic motive to conspire, summary judgment would still have been appropriate in light of the fact that "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Id.* at 597 n. 21, 106 S.Ct. at 1361 n. 21 (citing *Monsanto,* 465 U.S. at 763–64, 104 S.Ct. at 1470–71). The Court indicated that, in such circumstances, the plaintiff must come forward with "sufficiently unambiguous" evidence " 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.,* 475 U.S. at 588, 597, 106 S.Ct. at 1356, 1362 (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471).

However, as Professor Areeda has cautioned, "It is important not to be misled by *Matsushita*[ ]." Areeda, ¶ 1405' at 1021 (Supp.1993). "The Court surely did not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct." *Id.* The Court said that plaintiff's evidence need only "tend" to exclude the possibility that the defendants acted independently. *Id.* Moreover, the Court surely did not mean that a trial court must find for defendants as matter of law "whenever the court concludes that inferences of conspiracy and inferences of innocent conduct are equally plausible." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d 432, 438 (9th Cir.1990), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991). First, because "circumstantial evidence is nearly always evidence that is plausibly consistent with competing inferences," *id.* at 439, such "an approach would imply that circumstantial evidence alone would rarely be sufficient to withstand summary judgment [or judgment as a matter of law] in an antitrust conspiracy case," and indeed "would seem to be tantamount to requiring direct evidence of conspiracy." *Id. Compare United States v. Henderson,* 693 F.2d 1028, 1031 (11th Cir.

1982) ("[circumstantial] evidence is not testimony to the specific fact being asserted, but testimony to other facts and circumstances from which the jury may infer that the fact being asserted does or does not exist") *with Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir.1993) ("Evidence is direct when it is sufficient to prove discrimination without inference or presumption"). *Matsushita* did not dispense with circumstantial evidence as a basis for finding a conspiracy. *See Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471 (plaintiff must "present direct or circumstantial evidence" that reasonably tends to prove that the defendants were engaged in a conspiracy rather than acting independently).

Second, "[t]o read Matsushita as requiring judges to ask whether the circumstantial evidence is more 'consistent' with the defendants' theory than with the plaintiff's theory would imply that the jury should be permitted to choose an inference of conspiracy only if the judge has first decided that he would himself draw that inference." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 906 F.2d at 438. Under this approach, the judge would essentially be "a thirteenth juror, who must be persuaded before an antitrust violation may be found." *Id. Matsushita* should not understood as having brought about such "a dramatic judicial encroachment on the province of the jury." *Id.*

Instead, as Professor Areeda has explained, *Matsushita*'s "context made clear that the Court was simply requiring sufficient evidence to allow a reasonable factfinder to infer that the conspiratorial explanation is more likely than not." Areeda, ¶ 1405' at 1021 (Supp.1993). The question then is what is "sufficient evidence"? The critical import of *Matsushita* is in its statement that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." 475 U.S. at 588, 106 S.Ct. at 1356. *Matsushita*, therefore, does not prohibit reliance on circumstantial (that is, ambiguous) evidence; it merely limits the range of permissible inferences that may be drawn from such evidence.

 This inferential limitation is grounded in the unique nature of the law of antitrust conspiracy. In general, a conspiracy is an agreement or mutual understanding between two or more persons that they will act together for some purpose. However, a Sherman Act conspiracy differs sharply from the more typical concept of conspiracy found in other contexts. Under the criminal drug laws, for example, both the underlying act and the conspiracy are illegal—that is, the laws make it an offense for anyone to violate, as well as conspire to violate, the federal drug statutes. *See e.g.*, 21 U.S.C.A. § 846. In contrast, under the Sherman Act, it is the conspiracy alone that is prohibited; the underlying independent conduct is not necessarily unlawful and, indeed, may be procompetitive and of a nature that the antitrust laws would want to foster. "The antitrust laws are thus peculiar in that a conspiracy creates the initial illegality." Areeda, ¶ 1402a at 9 (1986). As Professor Areeda has explained, "setting one's own profit-maximizing price is," for example, "entirely lawful under the antitrust laws"; the antitrust laws are "concerned with such price fixing only when it is the subject or result of a conspiracy." *Id.* Because of this peculiar but important distinction, courts have the added responsibility in antitrust conspiracy cases of assuring that underlying lawful conduct is not brought within the prohibitive reach of the law, even inadvertently; they must be careful to condemn only that conduct—that is, the agreement—that Congress intended to fall within the reach of the antitrust laws. *Matsushita* teaches that the determination of whether underlying circumstantial conduct is sufficient to support an inference of a Sherman Act violation, and thus to fall within the prohibitive reach of the Act, is a legal issue for the court. Of course, if the underlying conduct is sufficient to support such an inference, it is still up to the jury to make the inference.

 The evidence presented by the plaintiffs in this case was in large measure circumstantial and consisted of, first, expert testimony and documentary evidence of parallel pricing and, second, anecdotal testimony suggesting price fixing. Defendants argue that expert testimony and documentary evidence did not reflect that there was parallel pricing among them at all times. But, if the evidence reflects that the defendants entered

into a price-fixing conspiracy, the fact that they did not observe the conspiracy on all occasions for all types of gasoline does not defeat the charge of price fixing. What is critical is that the jury could, and apparently did, reasonably conclude from the evidence that the defendants engaged in parallel pricing for some of their gasoline products for substantial periods of time.

Defendants are correct, however, that mere parallel pricing does not, standing alone, establish the existence of a conspiracy. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corporation,* 346 U.S. 537, 541, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954); *Aviation Specialties, Inc. v. United Technologies Corporation,* 568 F.2d 1186, 1192 (5th Cir.1978). If persons acted similarly, but independently of one another, without any agreement or mutual understanding among themselves, then there would be no conspiracy. The Sherman Act is directed not against uniformity of prices or price levels charged, but against the determination of prices or price levels by agreement among competitors. Rather, parallel conduct is a factor "to be weighed, and generally to be weighed heavily." *Morton Salt Company v. United States,* 235 F.2d 573, 577 (10th Cir. 1956). There must therefore be parallelism accompanied by *substantial additional evidence* to support a finding of an agreement necessary to establish a violation of § 1 of the Sherman Act. *Theatre Enterprises,* 346 U.S. at 541, 74 S.Ct. at 259–60. This substantial additional evidence may take many forms. Areeda, ¶¶ 1434a–1434e at 213–21 (1986).

The reason behind this requirement of substantial additional evidence is, as stated earlier, that the law should not be inadvertently used to condemn non-conspiratorial conduct. The requirement is intended to help assure that there is a reasonable basis to conclude that persons exchanged assurances of common action or otherwise adopted a common plan, albeit not necessarily through meetings, conversations, or exchanged documents.

Plaintiffs argue that they presented substantial additional evidence that this parallelism was so aberrant that it could not have been inadvertent but rather could only have resulted from a conscious agreement among defendants to fix prices. Admittedly, the plaintiffs' experts testified that the pricing activities of defendants in the Dothan market differed in significant respects from what could be reasonably expected in a comparable but fully price-competitive market. There were prolonged periods of identical pricing followed by almost simultaneous changes; prices did not vary over time and between competitors. Although, because of their name-recognition, major-brand dealers often charged more than other dealers, there was no price difference between major-brand dealers and other dealers in Dothan; indeed, in one instance, the non-major brand dealers beat the majors in raising their prices by ten cents a gallon. A drop in gasoline wholesale prices did not result in a corresponding drop in retail prices. And finally, when this lawsuit was filed in April 1990, defendants lowered their prices by five to six cents a gallon. A review of data gathered by defendants on 28 other Alabama towns reflected that, in all but two of these towns during this time, the prices were rising or staying the same and, in the two towns, the price dropped less than two cents.

However, this evidence could merely reflect lawful "interdependent conscious parallelism," that is, parallelism based upon the belief that "the profitability of [the firm's] decision depends upon rivals' reaction." Areeda, ¶ 1434c at 214 (1986). Professor Areeda explains this concept in more detail as follows:

"When [competing] firms are few in number—a so-called oligopoly—each is aware that its output variations are significant enough to affect market price. Each firm's pricing decision is *interdependent* with that of its rivals: each knows that his choice will affect the others, who are likely to respond, and that their responses will affect the profitability of his initial choice. Each knows that expanding his sales or lowering his price will reduce the sales of rivals, who will notice that fact, identify the cause, and probably respond with matching price reduction. Unless he can somehow conceal his price reduction, or unless his own position is improved by a lower

market price, he will hesitate to reduce prices at all.

"A similar process can explain a price rise through oligopolistic price leadership. When one oligopolist raises his price, each of his rivals must decide whether to follow or not. Continuing the previous price would allow each of the others to increase his sales if the leader persists in charging a higher price. But each knows that the leader is likely to retract an increase that is not followed. Accordingly, each rival asks himself whether he is better off at the lower price when charged by all or at the higher price when charged by all. If the latter, as will often be the case, the leader's price increase is likely to be followed."

¶ 1410b at 65 (emphasis in original). Whether Professor Areeda's observations are always applicable to certain types of markets is a question this court need not answer; it is sufficient that "such pricing behavior *can* occur when the number of significant rivals in a market is sufficiently small." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d at 443 (emphasis added). Moreover, that interdependent conscious parallelism could occur in Dothan among defendants is especially evident. Because, relatively speaking, the community is small without a large number of retailers and because gas prices were placed on large signs for public viewing, it was easy, if not expected, for each retailer to know what the other was charging and to respond immediately to the other's changes.

■■■■ Plaintiffs further argue that there was substantial additional evidence that defendants' parallel pricing was against their self interest. Admittedly, the fact that a firm's action is against its self interest could support a finding of a conspiracy. *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1456 n. 30 (11th Cir.1991) ("it is

well settled in this circuit that evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest"); *Aviation Specialties, Inc.,* 568 F.2d at 1192 ("significant probative evidence ... that the defendants engaged in (1) consciously parallel action, (2) which was contrary to their economic self-interest so as not to amount to a good faith business judgment" could support a § 1 violation). But the concept of "action against self interest" is an ambiguous one and one of its meanings could merely constitute a restatement of interdependence. For example, refusing to raise or lower prices unless rivals do the same could be against a firm's self interest but it would constitute mere interdependence. Similarly, a firm's motivation, if the motivation is merely to meet rival prices, would constitute only interdependence. Areeda, ¶ 1434c at 214–215 (1986). Therefore, to satisfy the requirements of a conspiracy, the action that is against self interest must go beyond mere interdependence. An example given by Professor Areeda is "the act which would be against self interest unless rivals act the same but where individual action would be so perilous in the absence of advanced agreement that no reasonable firm would make the challenged move without such agreement." *Id.* at 215. Therefore parallel price fixing which would be so unusual that in the absence of advanced agreement no reasonable firm would engage without such an agreement could be sufficient to establish a conspiracy. In such a scenario, the conspiracy would not be based on parallel price fixing alone but on parallel pricing in conjunction with other background evidence which reflected that in absence of advance agreement the rival firms would not engage in such parallel conduct.[9] Plaintiffs here have not

---

9. Early in this litigation, plaintiffs argued that unless a defendant's explanation for parallel conduct is "procompetitive," the court must find for the plaintiffs. The plaintiffs premised this argument on a statement by the Eleventh Circuit Court of Appeals in *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1574 (11th Cir. 1991), that, where a defendant can put forth a "plausible, procompetitive explanation for his actions," a court should be reluctant to find from circumstantial evidence that an antitrust viola-

tion has occurred. The plaintiffs have, however, twisted the quote from *Seagood.* The Appellate Court merely stated that, if the defendants' reason is procompetitive, and thus plausible, a court should not find a conspiracy. The court did not say, or intend, that procompetitiveness is a prerequisite for a finding that a conspiracy did not exist. Indeed, as shown above, an anticompetitive motive could very well result from nothing more than an effort to survive because of interdependence among the firm and its rival.

shown that defendants acted to this degree against their self-interest.

The court is, however, convinced that plaintiffs' anecdotal evidence, in conjunction with their evidence of parallelism, supports the jury's finding of an illegal agreement to fix prices among all defendants except Sunshine–Jr. Stores. The evidence was substantial that Vernon Cannon, Rodney Parrish, Thomas Shirley and his son, and James Sheffield entered into one or more agreements to fix prices. Eugene Welch, a former employee of Cannon Oil, testified to the following: Vernon Cannon successfully predicted how others in Dothan were going to raise their gasoline prices. Cannon would also call Thomas Shirley and ask him to raise Home Oil Company prices, and Cannon would call Parrish and ask him to have Sunshine–Jr. Stores raise its prices. In his conversations with competitors, apparently to disguise the nature of the conversations, Cannon would often use the code words "eggs and oranges" when referring to gasoline prices. Cannon Oil and its competitors, with the exception of Sunshine–Jr. Stores, often moved their prices up in tandem or almost in tandem; Sunshine–Jr. Stores would, however, follow suit shortly after Cannon had contacted Parrish. The prices in the areas surrounding Dothan were significantly lower than those in Dothan, and when prices changed in Dothan they did not change in the surrounding areas.

Charles Vann Carter, one of the defendants' competitors, testified to the following: Over the years Parrish and Thomas Shirley's son often visited or telephoned Carter to inform him that "everyone" in the Dothan Area was about to increase gasoline prices and to ask Carter to change his prices to meet the changes. The prices would usually increase as predicted by Parrish and Shirley's son. Shirley's son stated to him that Cannon wanted everyone to "go along" with the price changes. On one occasion, Carter asked Parrish why Sunshine–Jr. Stores was later than the other companies in raising prices, and Parrish responded that "it just takes a little longer to get in touch with Sunshine Jr."

Marion D. Harmon, who was employed by Thrifty Petroleum, testified that, sometime prior to 1984, Vernon Cannon and Thomas Shirley came by Thrifty's Dothan store, and Cannon angrily complained to him that his prices were below Cannon Oil's. Harmon explained to Cannon and Shirley that he did not control the prices and the prices were set by company officials in Montgomery.

Karen D. Bell, who worked for Parrish, testified to the following: Parrish often received telephone calls from his competitors, including Vernon Cannon, Thomas Shirley, and Shirley's son. Also, Shirley, his son, and other competitors often visited Parrish, and, during these visits, Bell heard them mention gasoline prices. After these visits there was often an increase in prices among competitors within a day or so. Indeed, immediately following these visits, in order to take advantage of current prices before the anticipated increase, Bell would fill up her own car with gasoline and would have her relatives do the same.

C. Diane Leach, who also worked for Parrish, testified to the following: Parrish received calls and visits from his competitors, including Vernon Cannon, Thomas Shirley, and Shirley's son. In the spring of 1988, shortly after a visit from Cannon, Shirley, and two other competitors, Leach overheard Parrish complain that "Tom [Shirley] hasn't raised his prices yet."

Stephen Spicer, who worked as a computer operator for Cannon Oil, testified to the following: In the mid–1980's, Spicer overheard Vernon Cannon talking over the telephone to James Sheffield about prices in Ozark, a small city about 25 miles north of Dothan. Cannon asked Sheffield "what the price was that day in Ozark," and Cannon said "I'll meet you at such and such in the morning." In their conversation the two men "agreed" to the prices. In addition, on other occasions, Spicer overheard "similar conversations" with "unidentified parties" regarding prices in Dothan.

James Ney, who worked for Cannon Oil, testified to the following: Ney overheard Vernon Cannon discuss price changes with individuals "Tom" and "Jimmy" over the telephone, and, after one of these calls, Cannon instructed Ney to change the prices listed on Cannon Oil signs. Shirley's first name was "Thomas," and Sheffield's first name was

"James." On one occasion, early in the morning, when Ney went to one of the Cannon Oil stations to change the sign prices, he noticed that the station across the street was changing its sign prices at the same time to match Cannon Oil's prices. On another occasion, in a morning meeting of some of Cannon Oil's employees to discuss gasoline prices, Cannon said to the employees "you know, we don't control any prices," and then Cannon looked at them "with a little smile."

 To be sure, the mere fact that defendants met together or telephoned each other, while probative, would not support a finding by itself that they had engaged in an effort to fix prices. "Such proof satisfies the necessary precondition of any traditional conspiracy that the parties have the opportunity to conspire," Areeda, ¶ 1417b at 97 (1986), but "it remains the plaintiff's burden to prove that the defendant succumbed to the temptation and conspired." *Id.* Here, plaintiffs have shown through anecdotal evidence, in conjunction with the evidence of parallel pricing, that Vernon Cannon, Rodney Parrish, Thomas Shirley and his son, and James Sheffield did just that—meet and conspire to fix prices. To be sure, the evidence gives us only a peek here and there, but when the many peeks are all put together, along with the evidence of substantial parallel pricing, a full picture emerges and that picture is one of a conspiracy among these men to fix and control gasoline prices in the City of Dothan. There may have been no formal or written agreement among them; but, to establish an illegal antitrust conspiracy a plaintiff need not show that defendants entered into any express, formal, or written agreement or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. Areeda, ¶ 1401 at 7, ¶ 1404 at 19–20 (1986). All that plaintiff must prove is that defendants in some way came to an agreement or mutual understanding to accomplish a common purpose; a "gentlemen's agreement" will do. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 179, 60 S.Ct. 811, 825,

84 L.Ed. 1129 (1940). All the evidence, both anecdotal and expert, shows that Cannon, Parrish, Shirley, Shirley's son, and Sheffield entered into just such a mutual understanding. *See, e.g., United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510 (1969); *Socony–Vacuum Oil Co., supra.*[10]

 The court cannot reach the same conclusion as to Sunshine–Jr. Stores. Although there was evidence that Parrish contacted Sunshine–Jr. Stores about its prices, this evidence consisted only of out-of-court statements by Parrish denied by him at trial; there was no evidence that any employee or acknowledged agent of Sunshine–Jr. Stores took any step to become a member of a price-fixing conspiracy among the other defendants. These out-of-court statements by Parrish are inadmissible as proof against Sunshine–Jr. Stores. Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement is not hearsay if it is offered against a party and was made "by a coconspirator of a party during the course and furtherance of the conspiracy." "These statements are admissible, however, only if a preponderance of the evidence shows: (1) the existence of a conspiracy; (2) the participation of the defendant and the declarant in the conspiracy; and, (3) that the declarant made the statement during the course and in furtherance of the conspiracy." *United States v. Beale*, 921 F.2d 1412, 1422 (11th Cir.), *cert. denied*, —— U.S. ——, ——, ——, 112 S.Ct. 99, 100, 264, 116 L.Ed.2d 71 (1991). In *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987), the Supreme Court permitted the trial court to examine the out-of-court statements themselves "in making a preliminary factual determination under Rule 801(d)(2)(E)," but did not address whether the trial court could rely on these statements alone in making a finding that a defendant participated in the conspiracy and thus that, assuming all other requirements of the rule are met, the statements are admissible. Here, assuming that the court can rely solely on Parrish's out-of-court statements, the

---

10. Although it could perhaps be argued that the anecdotal evidence alone would not support a conclusion of price fixing on the part of all these defendants—the evidence is admittedly stronger as to some defendants and weaker as to others—

the anecdotal evidence when considered with all other evidence substantially supports the conclusion that all these defendants engaged in price fixing.

court does not believe that this evidence is sufficient to find that Sunshine–Jr. Stores was a member of the other defendants' conspiracy.[11]

■ In any event, that Parrish contacted Sunshine–Jr. Stores as he allegedly said he did would not support a finding that Sunshine–Jr. Stores was a member of the conspiracy. It is unclear from this evidence whether Parrish was merely complaining to Sunshine–Jr. Stores or was actually fixing prices with the company. Evidence that one dealer complained to another about prices would be insufficient proof of a conspiracy; the proof must show that the dealer sought and obtained an agreement to maintain a certain price. *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir.1986). Moreover, of all the defendants, the evidence of parallel pricing was weakest as to Sunshine–Jr. Stores. Rather than acting in tandem with the other defendants, Sunshine–Jr. Stores usually raised its prices a period of time after the others, strongly indicating that Sunshine–Jr. Stores was acting interdependently, if not fully independently. *See, e.g., Orval Sheppard Real Estate Co. v. Valinda Freed & Assoc., Inc.*, 608 F.Supp. 354, 357 (M.D.Ala.1985) (Thompson, J.), *aff'd*, 800 F.2d 265 (11th Cir.1986) (table).[12]

## III. PLAINTIFFS' MOTION FOR TREBLING OF DAMAGES

■ As stated, § 4 of the Clayton Act provides that "any person who shall be in-

jured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained." 15 U.S.C.A. § 15 (West Supp.1993). Plaintiffs are correct that the trebling of damages under this provision is mandatory. *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975).

In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court observed that "nominal damages" constitute more a "recognition" of an important right than an actual monetary recovery under the right. The Court wrote that, "By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury." *Id.* at 266, 98 S.Ct. at 1054. Therefore, if a plaintiff's nominal damages recovery constituted merely a recognition of a violation of his rights then it could be argued that he was not "injured in his business or property" as required for treble damages under § 4.

■ However, without objection from the parties, the court in its instructions to the jury defined nominal damages as follows:

11. There was evidence that Parrish and an employee of Sunshine–Jr. Stores, Jim Burkhalter, were friends and had met on one or more occasions in Panama City, Florida. However, both men denied discussing gas prices, and the mere fact that they met is insufficient to support a finding that they fixed prices, even in the face of evidence of independent and interdependent of parallel pricing. There was also evidence that Burkhalter was friends with and had met other defendants. However, as stated, the mere fact that defendants met together or telephoned each other, while probative, would not support a finding by itself that they had engaged in an effort to fix prices. Areeda, ¶ 1417b at 97 (1986).

Plaintiffs also suggest that Burkhalter gave false testimony before and during the trial. Burkhalter's false testimony would merely serve to impeach him and to discredit his denial of involvement in the other defendants' conspiracy; it cannot, however, be the basis for an affirmative finding of his involvement without any affir-

mative evidence to that effect. In other words, if there were other credible and substantial evidence of Burkhalter's (and, by implication, Sunshine–Jr. Stores') involvement in the price-fixing conspiracy, then Burkhalter's denial of involvement could be discredited by his false testimony, and a jury could reasonably find that he was a part of the conspiracy; but in such case the finding of his involvement would be based on the other credible and substantial evidence.

12. The evidence suggests that, after this lawsuit was filed, defendants abandoned their parallel pricing. This evidence, by itself, would merely reflect that, perhaps out of fear of this litigation, defendants abandoned, not any agreement to fix prices, but rather their interdependent conscious parallel pricing. Nevertheless, this evidence, in conjunction with the evidence of the pre-litigation parallel pricing and the anecdotal evidence, supports the conclusion that all defendants, except Sunshine–Jr. Stores, fixed prices.

"However, if you find that the Plaintiffs have established by a preponderance of the evidence that the Defendants violated Section 1 of the Sherman Act and that, as a result, the Plaintiffs have sustained damages but not in a substantial amount, then you may return a verdict for the Plaintiff class in some nominal sum such as one dollar."

Therefore, in order to award nominal damages in this case, the jury had to have found that the plaintiffs sustained some damages. The jury's nominal damages award reflected not only a recognition of a violation of § 1 of the Sherman Act, but also a finding of actual injury to the property of the plaintiffs, as required for relief under § 4 of the Clayton Act. Nevertheless, the nominal damages award, while reflecting actual damages, did not reflect the amount. Under these circumstances, a trebling would be meaningless.[13]

## IV. PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

■ Plaintiffs also seek prospective injunctive relief pursuant to § 16 of the Clayton Act. 15 U.S.C.A. § 26 (West Supp. 1993).[14] Admittedly, the plaintiffs recovered only nominal damages and it appears that defendants ceased their illegal conduct after the filing of this litigation. However, these circumstances do not preclude the issuance of an injunction if the evidence and circumstances otherwise warrant such.

In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), the Supreme Court rejected as "unsound" the notion that the "failure to prove the fact of injury barred injunctive relief." The Court found that, even in the absence of actual past and cur-

rent injury, "threatened injury" and "the necessities of the public interest" may independently still warrant a prospective injunction. The Court wrote:

"[Section] 16 of the Clayton Act, 15 U.S.C. § 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened' injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur. "Moreover, the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws. Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' Its availability should be 'conditioned by the necessities of the public interest which Congress has sought to protect.'"

*Id.* at 130–31, 89 S.Ct. at 1580 (citations and footnotes omitted).

Here, the threat of resumption of the conspiracy remains real. First, the defendants—that is, Cannon, Parrish, Shirley, and Sheffield and their employees—ceased their illegal price-fixing activity only after this lawsuit was filed. It was this litigation alone

---

**13.** Defendants appear to suggest that nominal damages are neither appropriate under nor authorized by the Sherman and Clayton Acts. However, because none of the parties objected to the court's instructions on nominal damages or otherwise contended that the instructions were an incorrect statement of law, it is now too late for them to complain that nominal damages—at least, as specifically defined in the court's instructions—are not a type of relief which a jury may award under the antitrust laws.

**14.** Section 16 provides in part:
"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive

relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings.... In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff."

that brought an end to their illegal conduct. The court is convinced, however, that once this litigation is over the defendants will more likely than not resume their illegal conduct. Second, the defendants and some of their employees not only have failed to acknowledge their wrong-doing, they have willfully testified falsely that they did not engage in price fixing and that they acted innocently. Their false testimony actually impeded and obstructed this litigation. *Cf.* U.S.S.G. § 3C1.1, comment. (n. 3) (1992) ("providing materially false information to a judge or magistrate" constitutes obstructing or impeding the administration of justice, warranting a higher sentence for a criminal defendant). This obstructionist conduct, which the court believes was also conspiratorial and by agreement among defendants, leads the court to believe that defendants are far from having abandoned their illegal ways; indeed, in a very real way, the conspiracy—in that it now manifests itself in false testimony—continued throughout the trial and continues today. Defendants' obstructionist conduct, in conjunction with their conspiracy to fix prices, convinces the court that the likelihood of recidivism on their part is not only likely it is great.

The court is further convinced that the continued operation of the conspiracy poses a "significant threat of injury." *Zenith Radio Corp.*, 395 U.S. at 130, 89 S.Ct. at 1580. First, as previously shown, the nominal damages as defined in this case and as awarded by the jury represented a finding of actual injury to the plaintiffs. Second and in any event, defendants' continued and future illegal activity, if unrestrained by this court, poses the probability of substantial damages. As the Supreme Court recognized in *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), price-fixing may, and quite often does, result in reasonable prices. But the danger is that a reasonable price fixed by agreement today may through economic and business changes become unreasonable tomorrow. Indeed, it is because it is so difficult to determine whether a fixed price is unreasonable at one point in time that price fixing is a per se violation of the Sherman Act. As the Supreme Court has explained,

"The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions."

*Id.* at 397, 47 S.Ct. at 379.

Finally, even in the absence of a threatened injury, "the necessities of the public interest" would still warrant a prospective injunction. That a defendant's illegal price-fixing activity may not in the past have resulted in unreasonable prices and may not even result in the future in unreasonable prices does not mean that the public does not need protection. The injury to the public is merely in the individual acquiring "The power to fix prices." *Trenton Potteries Co.*, 273 U.S. at 397, 47 S.Ct. at 379. It does not matter whether that power is "reasonably exercised or not." *Id.*[15]

---

15. *In re Corrugated Container Antitrust Litigation*, 756 F.2d 411 (5th Cir.1985), and *United States Football League v. National Football League*, 842 F.2d 1335 (2d Cir.1988), relied upon by defendants, do not warrant denying injunctive relief in this case. First of all, in *Corrugated Container*, the jury did not find, as did the jury in the instant case, that plaintiffs had suffered actual antitrust damages. In *National Football League*, plaintiffs did not appeal from the trial judge's finding that the illegal antitrust activity was not likely to continue or reoccur, and the appellate court otherwise found that injunctive relief was not appropriate under the antitrust laws. But second and more importantly, whether injunctive relief is appropriate should be determined on a case-by-case basis. The specific factual circumstances presented to this court, for the reasons given,

The court cannot, however, acquiesce in the entire wording of the injunction proposed by plaintiffs. First, plaintiffs' proposed injunction is open ended; it has no sunset. This litigation must eventually come to an end. The court believes that a three-year injunction, which would keep the threat of this litigation over defendants for an additional three years, would be sufficient. Second, plaintiffs' proposed injunction is too vague and covers conduct that is not only clearly legal but could conceivably be pro-competitive. For example, the proposed injunction prohibits the defendants from "engaging in any conduct or in any other communications which tend to facilitate the fixing of the retail price of gasoline in Dothan, Houston County, Alabama." The court agrees, however, that the injunction should include language, as suggested by plaintiffs, which prohibits defendants from "agreeing, directly or indirectly, to fix the retail price of gasoline in Dothan, Houston County, Alabama." The injunction should also require that defendants take affirmative steps to undo their price-fixing conspiracy. The affirmative steps could include educating defendants' employees about the Sherman Act's prohibition on price-fixing and adopting personnel policies and procedures to help assure that defendants and their employees do not engage in price-fixing in the future.

The court will enter an injunction today prohibiting defendants Cannon Oil Company, Thomas Shirley, Home Oil Company, James Sheffield, Sheffield Oil Company, and Rodney Parrish from agreeing, directly or indirectly, to fix the retail price of gasoline in Dothan, Houston County, Alabama.[16] However, in order to give adequate consideration to the other concerns discussed above, the court will give these defendants an opportunity to propose to the court supplemental language to be included in the injunction.

An appropriate order and injunction will be entered.

warrant such relief against defendants Cannon Oil Company, Thomas Shirley, Home Oil Company, James Sheffield, Sheffield Oil Company, and Rodney Parrish.

## ORDER AND INJUNCTION

In accordance with the memorandum opinion entered this day, it is the ORDER, JUDGMENT and DECREE of the court:

(1) That the following motions filed by defendants are denied: Metha Jean Cannon and Cannon Oil Company's motion for judgment as a matter of law, filed on June 4, 1992; Thomas Shirley and Home Oil Company's motion for judgment as a matter of law, filed on June 8, 1992; James Sheffield and Sheffield Oil Company's motions for judgment as a matter of law, filed on June 1, 1992; and Rodney Parrish's motion for judgment as a matter of law, filed on June 3, 1992;

(2) That defendant Sunshine–Jr. Stores' motion for judgment as a matter of law, filed on June 3, 1992 is granted, that the judgment entered on May 22, 1992, is vacated as to defendant Sunshine–Jr. Stores, and that judgment is entered in favor of defendant Sunshine–Jr. Stores and against plaintiffs;

(3) That plaintiffs' motion to amend to reflect treble damages, filed on May 29, 1992, is denied;

(4) That plaintiffs' motion for a permanent injunction filed on May 29, 1992, is granted;

(5) That defendants—Cannon Oil Company, Thomas Shirley, Home Oil Company, James Sheffield, Sheffield Oil Company, and Rodney Parrish—their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise, are each ENJOINED and RESTRAINED from agreeing, directly or indirectly, to fix the retail price of gasoline in Dothan, Houston County, Alabama;

(6) That defendants are DIRECTED to file with the court by December 8, 1993, supplemental language to be included in the injunction; and

(7) That the injunction entered this date shall expire on November 19, 1996.

**16.** Because Vernon Cannon is now deceased, he will not be included in the injunction.

1474

It is further ORDERED that the United States Marshal for the Middle District of Alabama or his representative shall personally serve a copy of this order and injunction on defendants Cannon Oil Company, Thomas Shirley, Home Oil Company, James Sheffield, Sheffield Oil Company, and Rodney Parrish.

It is further ORDERED that the clerk of the court shall issue a writ of injunction.